FILED

2022 Mar-23  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| KATHERINE LORAINE WALDROP, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   4:20-cv-00961-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Katherine Waldrop seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits.   The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.   The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 8).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00–114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would

2

prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the

evaluator will not find the claimant disabled.   *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Id.* (citations omitted).   Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision.   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Waldrop, age 43 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on November 1, 2018, alleging disability as of April 1, 2017.  (Tr. 50, 269-75).  The Commissioner denied Waldrop's claim, and Waldrop timely filed a request for an administrative hearing.  (Tr. 189-208, 211-12).  The Administrative Law Judge ("ALJ") held a hearing on November 14, 2019 (Tr. 44-70), and issued a decision on January 29, 2020, finding Waldrop not disabled.  (Tr. 24-39).

Applying the five-step sequential process, the ALJ found at step one that Waldrop did not engage in substantial gainful activity after her alleged onset date of April 1, 2017.  (Tr. 29).  At step two, the ALJ found Waldrop had the severe impairments of obesity, diabetes mellitus, and status/post-cervical surgery.  (*Id.*).  At step three, the ALJ found that Waldrop's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 32).

Next, the ALJ found that Waldrop exhibited the residual functional capacity ("RFC") to perform a full range of medium work.  (*Id.*). At step four, the ALJ determined Waldrop could perform her past relevant work as an accounting clerk and loan processor.  (Tr. 38).  Accordingly, the ALJ determined that Waldrop did not

suffer a disability, as defined by the Social Security Act, from April 1, 2017, through the date of the administrative decision.   (Tr. 39).

Waldrop timely requested review of the ALJ's decision.   (Tr. 265-68).   On June 23, 2020, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-4).   On July 7, 2020, Waldrop filed her Complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Waldrop argues the ALJ improperly applied the pain standard and improperly found she could perform her past work.   She also asserts the Appeals Council improperly failed to review new evidence from Dr. June Nichols.   For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I.   The ALJ Properly Evaluated Waldrop's Subjective Symptoms

Waldrop first asserts the ALJ improperly evaluated her complaints of pain and other subjective symptoms.

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Wilson*[ *v. Barnhart*], 284 F.3d [1219,] 1225[ (11th Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11th Cir. 2021). A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminates the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarifies that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." 2016 WL 1119029 at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective

testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Waldrop testified that at least once a week, she does not eat because her stomach feels so upset.   (Tr. 57).   She experiences back pain at a level eight of ten, with medication from a pain management specialist.   The pain does not cause numbness or tingling in her extremities.   And, her neck pain feels better since her surgery.   (Tr. 58-59).   Her mental state has regressed as her health has deteriorated.   She constantly cries, feels angry, and does not understand why she has to experience health problems at her age.   (Tr. 60).   Approximately four to five times each month, she experiences upper quadrant stomach pain.   (Tr. 61).   She estimated she could stand for an hour and walk for less than an hour.   It takes her two to three days to clean her 1,500-square-foot home because she experiences back pain and fatigue from her diabetes.   After she completes the cleaning, she needs to rest before she can do anything else.   (Tr. 62). She estimated she would need to miss work two times a week due to her condition. (Tr. 63).

The ALJ found Waldrop's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but Waldrop's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence.   (Tr. 33).   The ALJ reasoned:

> [W]hile the medical evidence shows [a] diagnosis of diabetes and a prior history of cervical spine surgery, the objective evidence does not support the claimant's allegations of severe functional limitations from these

impairments.  Notably, examinations in the record show few objective findings.  Additionally, while the claimant complained of severe back pain, imaging in the record does not support the claimant's subjective pain complaints, as they show no more than mild degenerative changes without disc herniation or nerve root impingement.  Moreover, treatment notes show routine treatment for diabetes and again, [do] not support the severity of functional limitations alleged by the claimant.

(Tr. 34).

He also stated:

Overall, the claimant's allegations of severe functional limitations related to her severe impairments are not supported by the objective evidence.  Although the claimant has received treatment for her impairments, that treatment has been essentially routine and conservative in nature, and generally successful in managing the claimant's symptoms.  Treatment records do not substantiate the frequency and severity of symptoms described by the claimant.  The claimant did not allege any symptoms related to diabetes, such as dizziness other than fatigue [*sic*], which treatment records indicate she specifically denied on multiple occasions.  The claimant also did not specifically allege any symptoms related to her prior cervical surgery, and instead reported that she did not experience any neck pain.  Moreover, treatment notes show the claimant's impairments are treated routinely with no evidence of frequent need for emergent treatment for symptom stabilization or crisis intervention.  While the claimant has complained of lower back pain, and limited ability to walk, stand or exercise due to this pain, physical examinations and observations in the record do not reveal significant functional limitations and as noted earlier, imaging showed only mild degenerative changes.  Additionally, examinations in the record show no real basis for limitations as the claimant has functional range of motion of all joints, and examinations are generally noted to be normal except for one occasion of tenderness to palpation over the lumbar spine, and one positive straight leg test, with pain limited to the back.  Furthermore, examinations show normal strength, no evidence of muscle wasting, and no annotation of significant motor, sensory, or reflex deficits.  Moreover, even though the claimant testified that she was unable to exercise due to back pain, her treatment records show that she has been encouraged on

9

several different occasions to increase her activity level, to exercise and to lose weight.   Overall, any deficits shown by the objective evidence [have] been accommodated by the functional capacity adopted herein.

(Tr. 36-37).

Finally, the ALJ reasoned that Waldrop's daily activities

are not limited to the extent expected, given the complaints of disabling symptoms and limitations.   Despite her impairments, the claimant remains capable of living independently within her household, adequately tending to her personal care needs, preparing at least simple meals, taking care of the laundry, driving, shopping, and caring for her pet . . . . Additionally, treatment notes indicate that the claimant has been her mother's primary care giver since the death of her father in late 2016 . . . .

(Tr. 37).

All of those factors constituted permissible considerations in assessing the consistency of Waldrop's subjective complaints with the objective medical evidence. *See* 20 C.F.R.  §§ 404.1529(c)(3), (4).   In addition, the ALJ clearly and specifically articulated his reasons for the weight he afforded Waldrop's subjective symptoms, *see* 2016 WL 1119020 at *9.   *Wilson*, 284 F.3d at 1225.   Thus, the ALJ properly applied the Eleventh Circuit's pain standard and SSR 16-3p.

Substantial evidence also supported the ALJ's conclusions.   Waldrop testified her neck felt better after her cervical spine surgery (Tr. 59), and her medical records do not indicate any post-surgical complaints about her neck.   To the contrary, the records reveal Waldrop consistently reported feeling better, and she displayed full range of motion in her cervical spine.   (*See* Tr. 439, 443, 448, 457, 461, 464, 474, 488, 491-94,

10

562, 566, 581, 595, 599, 602, 605, 610, 614, 618, 628, 632, 636, 640, 673, 689, 704, 750, 760, 773, 777, 780, 791, 799, 825).

The treatment records also support the ALJ's finding Waldrop received only routine treatment for her diabetes, and the condition did not cause any limitations other than fatigue and occasional tingling.   (*See* Tr. 442-43, 448, 456-57, 460-61, 464-65, 472-73, 499, 516, 556-58, 560-62, 564-66, 578-82, 597-603, 609, 612-19, 626-42, 702-05, 771-82, 789-92).

Similarly, the treatment records support the ALJ's findings Waldrop received only routine, conservative treatment for her back condition, and treatment providers either recommended Waldrop exercise to relieve her back pain or counseled her about physical activity.   (*See* Tr. 460-62, 472-76, 481-86, 557, 561, 565, 597-607, 609, 613, 627, 631, 635, 639, 667-71, 703, 753, 772, 776, 790, 822-29).

The treatment records also support the ALJ's conclusion that clinical examinations of Waldrop's lumbar condition did not support the level of limitations Waldrop alleged, as the examinations consistently revealed good muscle strength, normal gait, normal range of motion, and no muscle wasting, sensory deficits, or leg numbness.   The records included only sporadic findings of tenderness upon palpation and one positive straight leg raise test.   (Tr. 440, 443-44, 449, 458, 461-62, 465, 474, 481, 484-86, 488, 500-02, 516, 558, 562, 566, 582, 595, 599, 602, 605, 610, 614, 618, 628, 632, 636, 640, 674, 689-90, 704, 750, 760-61, 773, 777, 780, 791, 800, 825-28).

A February 21, 2018, MRI of Waldrop's lumbar spine revealed only mild facet degenerative changes at L3-4, with no central canal or foraminal narrowing.   At L4-5, Waldrop displayed only a mild disc bulge and mild facet hypertrophy with mild to moderate right and mild left foraminal narrowing and no central canal narrowing.   At L5-S1, the disc bulge and facet hypertrophy caused only mild left foraminal narrowing. (Tr. 430-31).   Those results support the ALJ's conclusion that objective imaging did not support Waldrop's complaints of severe back pain.

Finally, the record supports the ALJ's conclusion that Waldrop's daily activities were not consistent with her complaints of disabling symptoms.   Waldrop's Function Report states that she can prepare simple meals and care for a pet.   She can care for her personal needs, but some tasks like dressing, bathing, and hair care take extra time because of her back pain.   She can do laundry and clean her house, but cleaning takes two or three days.   She can walk to the mailbox, drive a car, shop in stores for food and clothing, and handle her finances.   She can go places alone, though she rarely does so.   She does not use an assistive device to ambulate.   (Tr. 307-14).   In addition, her treatment records reveal that she cared for her mother.   (Tr. 472, 557, 561, 594, 609, 617).

In summary, the ALJ properly considered Waldrop's subjective complaints pursuant to the Eleventh Circuit's standard, and substantial evidence supported the ALJ's decision that the record as a whole did not support the limitations Waldrop

alleged.

## II.   The ALJ Properly Assessed Waldrop's Ability to Perform Past Work

As discussed, the ALJ found Waldrop could perform her past relevant work as an accounting clerk and loan processor.   (Tr. 38).   Waldrop argues the ALJ erred in that finding because he "did not consider all of the duties of the past work and evaluate [her] ability to perform those duties in spite of the impairments."   (Doc. 16, at 24).

The ALJ must determine whether a claimant can perform her past work, "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2).   That determination must include a specific "finding of fact as to the physical and mental demands of the past job/occupation." SSR 82-62, 1982 WL 31386, at *4; *see also Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir. 1986) ("In the absence of evidence of the physical requirements and demands of appellant's work the ALJ could not properly determine that she retained the residual functional capacity to perform it.").   To gather the pertinent information, the ALJ may rely upon the claimant's testimony, the testimony of other people familiar with the claimant's work, the testimony of a vocational expert, and/or the Department of Labor's Dictionary of Occupational Titles (DOT).   20 C.F.R. § 404.1560(b)(2).

The ALJ followed those requirements in this case.   During the administrative hearing, Waldrop testified she worked as both a loan processor and accounting clerk at Heritage South. (Tr. 51, 54).   At the end of each month, she had to scan paper ledgers

to save electronically, which required standing for three to four hours.  (Tr. 58).  In addition, Waldrop's Disability Report provided a description of her job duties, including accounting, wiring money between accounts, stopping payments, performing reconciliations, and administering payroll.  She used machines, tools, equipment, and technical knowledge or skills, but she did not draft any writings or complete reports. The job required her to walk four hours a day, stand two hours a day, handle large objects one hour a day, and write, type, or handle small objects one hour a day.  It never required her to sit, climb, stoop, kneel, crouch, crawl, or reach.  She lifted paper boxes weighing up to 50 pounds up to one-third of the workday.  She did not supervise others or act as a lead worker.  (Tr. 300).

The ALJ consulted a vocational expert to classify Waldrop's past relevant work pursuant to DOT guidelines.  The vocational expert classified Waldrop's past work as an accounting clerk at the sedentary level, but she opined that Waldrop performed it at the medium level.  The vocational expert classified Waldrop's past work as a loan processor as sedentary in exertional level.  (Tr. 65-67).  Neither the ALJ nor the vocational expert asked any additional questions about Waldrop's specific work duties, but the ALJ inquired whether the vocational expert possessed sufficient information to classify Waldrop's work history, and the vocational expert responded affirmatively. (Tr. 65).  Waldrop's briefs fail to identify any particular requirement of her past relevant

work that the ALJ overlooked, and she has not challenged the qualifications or testimony of the vocational expert.

Because the ALJ relied upon Waldrop's work reports, the vocational expert's testimony, and the DOT classifications, the court finds that he obtained sufficient information to appropriately classify Waldrop's past relevant work.  *See Williams v. Comm'r, Soc. Sec. Admin.*, 805 F. App'x 692, 695 (11th Cir. 2020) (citing 20 C.F.R. § 404.1560(b)(2)) ("In evaluating the demands of a claimant's past work, an ALJ may rely on the job descriptions set forth in the Dictionary of Occupational Titles (DOT) to determine the level of the work (from sedentary to very heavy) it required, as well as the claimant's own account of the work."); *Holder v. Soc. Sec. Admin.*, 771 F. App'x 896, 900 (11th Cir. 2019) (The ALJ appropriately relied on the claimant's testimony, his work history report, vocational expert testimony, and DOT descriptions to "paint a full picture of [the claimant's] past relevant work."); *Waldrop v. Comm'r of Soc. Sec.*, 379 F. App'x 948, 953 (11th Cir. 2010) ("[A]n ALJ may properly consider information in the DOT and a VE's testimony in determining whether a claimant can still perform her past relevant work."); *Savor v. Shalala*, 868 F. Supp. 1363, 1365 (M.D. Fla. 1994) ("[I]t is clear that the ALJ did determine the physical demands of the Plaintiff's past work and her ability to perform that work in light of her impairment.  The ALJ accomplished this by eliciting the opinion of a vocational expert.").

To the extent Waldrop challenges the ALJ's finding that she possessed the residual functional capacity to perform a full range of medium work, she offers no substantive argument or evidence to support that challenge.   Thus, she has not satisfied her "burden of proving that [s]he is unable to perform [her] previous work." *Jones v. Bowen*, 810 F.2d 1001, 1005 (11ᵗʰ Cir. 1986) (citing *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11ᵗʰ Cir. 1983)).   As discussed in the previous section, the ALJ properly assessed Waldrop's subjective complaints, and his decision that she did not suffer the level of impairments she alleged enjoyed substantial evidentiary support.   The record does not support the imposition of more serious physical limitations than the ALJ assessed. And as discussed in the following section, the record does not reflect serious mental health symptoms prior to the death of Waldrop's mother in April 2020.

Moreover, even if Waldrop did offer a properly developed and supported argument that she could not perform medium work, the ALJ also found her capable of performing her past work as a loan processor, which the ALJ classified as sedentary in exertional level.   Waldrop offered no argument that she could not perform sedentary work, and the evidence does not support a limitation below sedentary work.

In summary, as the ALJ properly assessed a residual functional capacity for medium work, and he properly assessed Waldrop's past work as requiring medium-level or lower exertion, he properly found Waldrop could perform her past work, and substantial evidence support his finding.

16

**III.    The Appeals Council Properly Considered the New Evidence Waldrop Submitted**

Generally, a claimant may present new evidence at each stage of the administrative process.   *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11ᵗʰ Cir. 2007) (citing 20 C.F.R. §404.900(b)).   The Appeals Council will review a case if it receives additional "evidence that is new, material, and relates to the period on or before the date of the [ALJ] hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."   20 C.F.R. § 404.970(a)(5).

Here, the Appeals Council received the following medical evidence after the ALJ's decision:   (1) Gastro Health records dated November 3, 2015; (2) Shelby Ambulatory Surgery records dated November 25, 2015, through November 30, 2015; (3) Coosa Valley Medical Center records dated May 24, 2015, through October 4, 2019; (4) Gastroenterology Associates records dated November 3, 2015, through November 30, 2015; (5) RMC Stringfellow Memorial Hospital records dated June 5, 2018, through August 16, 2018; (6) Anniston Gastroenterology Associates records dated August 1, 2018; (7) Alabama Digestive Health and Endo Center records dated July 25, 2019; and (8) CarePlus Family Medical records dated September 18, 2019, through December 18, 2019.   (Tr. 2).   However, it did not exhibit that evidence because it found it "does not

show a reasonable probability that it would change the outcome of the decision." (Tr. 2).

Waldrop does not challenge the Appeals Council's consideration of any of that evidence. Rather, she asserts the Appeals Council should have considered a May 26, 2020, Psychological Evaluation by June Nichols, Psy.D., of Gadsden Psychological Services, LLC. (Tr. 8-13). The record contains a copy of Dr. Nichols' evaluation, but the Appeals Council's order does not mention the evaluation.

Dr. Nichols reviewed Waldrop's medical records and considered Waldrop's description of her physical condition. Waldrop also reported a history of mental health counseling, but she did not believe it helped. Her mother, with whom she lived, passed away on April 3, 2020. (Tr. 9-10). Afterward, Waldrop "went into hysterics," went a month without showering, and neglected to take her insulin for so long that it resulted in a hospitalization. (Tr. 10). She experienced difficulty accepting her mother's death, and she felt uncertain about what to do with her life. (*Id.*).

During Dr. Nichols's mental status examination, Waldrop displayed fair eye contact, normal speech, depressed mood congruent with thought processes, and sad, tearful affect. She reported long-lasting sleep disturbances, poor appetite, decreased energy, anhedonia, and crying episodes, but she denied suicidal or homicidal ideation. She displayed clear stream of consciousness; full orientation; normal thought processes; no evidence of confusion, loose associations, tangentiality, flight of ideas, or thought

18

blocking; normal conversation; and no auditory or visual hallucinations, delusions, or ideas of reference.   She reported significant loneliness, but she did not appear to respond to any internal psychotic process.   She denied obsessions, compulsions, and panic attacks.   Dr. Nichols assessed good judgment and insight.   (Tr. 11).

Dr. Nichols's report omitted a characterization of the speed of Waldrop's mental processing, but she did state Waldrop could count from 20 to one in 16 seconds, perform Serial Three's but not Serial Seven's, spell the word "world" backward, and perform addition and subtraction, but she could not perform multiplication.   Dr. Nichols characterized Waldrop's recent memory function as grossly intact, her general fund of knowledge as adequate, and her thinking as abstract in nature.   Intelligence testing fell within the low average range.   (Tr. 12).

Waldrop reported living alone and spending most of her time watching television, though she occasionally cooks, cleans, does laundry, or runs errands with frequent breaks.   She does not attend church, participate in any community activities, or spend time with friends.   Her recent symptoms included:

> depressed mood, diminished interests or pleasure, sleep disturbance, fatigue, change in appetite, hopelessness, pleasure in few activities, agitation, excessive worry, irritability, poor concentration, tension, use of tobacco, makes careless mistakes, does not complete tasks, difficulty organizing, forgetful, confusion, disorientation, compulsive checking/counting, people talk about me, some people want to hurt me, racing thoughts, I do risky or dangerous things, little interest in sexual activity, I don't like my body, excessive fasting, impulsive, I have tried to

hurt myself, sometimes I wish I were dead, Exposed to a significant
traumatic event, recurrent distressing dreams.

(*Id.*).

In summary, Dr. Nichols stated:

Ms. Waldrop has a long history of reported depression, with
records indicating that it was first diagnosed in 2005. She has been
involved in counseling for extended periods, has taken breaks, then
returned to counseling. She re-entered therapy with AltaPointe in
September of 2019. At that point she again reported depression. The
relationships that she has had in the past have failed and she questioned,
"Is it me?" At that time she admitted violence in the relationship with
her last boyfriend, that involved both of them. She has no friends that
she has maintained contact with on any regular basis. She has never lived
independently, rather she has been in the home with her mother and
father. Her father died three years ago. Her mother was in kidney
failure and then was diagnosed with stage four heart failure in December
and died in March. She reported that the month following her mother's
death, she didn't bath[e], get up and do anything or take her medications
and wound up in the hospital because she had not taken her insulin.

At this time, Ms. Waldrop has no supportive relationships. She
has isolated since losing her job of 17 years. She is angry with her brother
and blames him for removing her mother from the home that she and her
mother shared and then one week later her mother had died. "I knew
that she didn't have much time, but I thought she had more than that."

Her medical records indicate multiple medical issues that included
digestive issues, Type II diabetes, chronic back pain, and arthritis.

The evaluation on this date indicates that Ms. Waldrop is
functioning in the Low Average range of intelligence, with significant
weakness with concept formation and abstract thinking skills.

She would be able to understand, remember and carry out very
simple instructions. She would not be able to maintain attention,
concentration and/or pace for periods of at least two hours. Deficits

20

with cognitive speed and inattention were noted in the psychoneurological administered in 2010.   She cannot perform activities within a schedule and be punctual within customary tolerances.   She cannot sustain an ordinary routine without special supervision.   She cannot adjust to routine and infrequent work changes.   She cannot interact with supervisors and or coworkers.   She tends to think that people are out to get her.   She cannot maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.   In addition to normal workday breaks, she would likely be off task 10-20% of an 8 hour day.   In a 30-day period, she would likely miss 5 days due to her psychological symptoms.   Her limitations existed back to 4/1/17.[2]

(Tr. 12-13).

Waldrop argues the Appeals Council applied the incorrect legal standard when it assessed whether a reasonable *probability* existed that the new evidence would change the outcome of the administrative decision, as it should have assessed whether a reasonable *possibility* existed of changing the outcome.   (Doc. 16, at 28).   That argument lacks merit.   Effective January 17, 2017, the Commissioner revised 20 C.F.R. § 404.970(a)(5) to include the above-stated requirement that new evidence must demonstrate a "reasonable probability" of changing the outcome of the ALJ's decision, with compliance required as of May 1, 2017.   *See* 81 FR 90987-01, 2016 WL 7242991 (Dec. 16, 2016).   Thus, the Appeals Council correctly applied the language of the regulation in effect on the date of Waldrop's appeal.

---

[2] Dr. Nichols also completed a Mental Health Source Statement form, on which she noted the same limitations assessed in the textual paragraph.   (Tr. 8).

The record contains no explanation as to the reason the Appeals Council did not list or exhibit Dr. Nichols' assessment.   However, even if the Appeals Council erred by the omission, it did so only harmlessly, as Dr. Nichols' May 26, 2020, assessment did not relate back to the time period before the ALJ's January 29, 2020, decision.

As the Eleventh Circuit recently reiterated, "'[m]edical opinions based on treatment occurring after the date of the ALJ's decision may be chronologically relevant.'" *Howze v. Soc. Sec. Admin.*, No. 21-11066, 2022 WL 152236, at *2 (11th Cir. Jan. 18, 2022) (quoting *Washington v. Social Security Administration, Commissioner*, 806 F.3d 1317, 1322 (11th Cir. 2015)).   The Eleventh Circuit explained the approach for evaluating the chronological relevance of such opinions:

> In *Washington*, the claimant submitted to the Appeals Council a psychologist's evaluation and accompanying opinion about the degree of the claimant's mental limitations, which were prepared seven months after the ALJ's decision. *Id.* at 1319.   We concluded that the psychologist's materials were chronologically relevant because: (1) the claimant described his mental symptoms during the relevant period to the psychologist, (2) the psychologist had reviewed the claimant's mental health treatment records from that period, and (3) there was no evidence of the claimant's mental decline since the ALJ's decision. *Id.* at 1322-23 (limiting its holding to "the specific circumstances of this case").

> But we have also held that the Appeals Council correctly declined to consider new medical records because the records were "about a later time" than the ALJ's decision, and, therefore, did not affect the decision about whether the claimant was disabled during the relevant period. *Hargress[ v. Soc. Sec. Admin., Comm'r*], 883 F.3d [1302,] 1309[ (11th Cir. 2018)]. In *Hargress*, we held that the new records were not chronologically relevant because nothing in them indicated that the doctor, who did not treat the claimant during the relevant period, had

22

reviewed the appellant's medical records, or that the information in the new records related to the period at issue. *Id.* at 1309-10.

*Howze,* 2022 WL 152236, at *2.

Dr. Nichols never treated Waldrop, but she reviewed Waldrop's medical and mental health records from the time period before the ALJ's decision, and she considered Waldrop's reports of symptoms from at least the previous two years. (Tr. 10 ("Ms. Waldrop reported that she started this battle two years ago.")). She also indicated Waldrop's limitations dated back to April 1, 2017, her alleged onset date. (Tr. 8, 13). Even so, the evidence indicates Waldrop's mental health condition declined between the date of the ALJ's decision and the date of Dr. Nichols' assessment.

Waldrop received mental health counseling in 2000 and 2005 for relational and identity problems, histrionic personality disorder, stress management, and depression. (Tr. 400-425). She underwent a neuropsychological evaluation in 2010 to assess potential learning disabilities before applying for an educational program. The evaluator concluded she likely did not suffer any concrete learning disabilities. Rather, her anxiety, depression, and sleep disturbances likely interfered with her abilities to concentrate, maintain attention, and process information. (Tr. 382-88). She recommended counseling in late 2012 and 2013 for depression, anxiety, stress management, and irritability. (Tr. 371-81, 390-99). Those records do not reflect disabling mental health limitations, and, indeed, Waldrop continued to work full-time

23

throughout those treatment periods.

Records from the period relevant to Waldrop's alleged onset date of April 1, 2017, reveal that she received mental health treatment on only one occasion, September 4, 2019. She reported that she had experienced depression and anxiety her entire adult life, but her symptoms had increased since her physical illnesses began to impact her ability to work. During the appointment, she displayed appropriate appearance, normal behavior and mood, euthymic affect, and pressured speech. She reported excessive appetite, poor sleep, and no self-injurious behavior or suicidal thoughts for several years. She displayed normal perception and memory, impaired concentration, fair judgment and insight, and mild anxiety. She used tobacco and caffeine, but she did not use alcohol or drugs, and she did not gamble. She never had a successful long-term relationship, and some past relationships included mutual violence. Her physical and emotional condition limited her ability to care for herself. She did not participate in any recreational, leisure, community, or church activities. She described herself as stressed and angry, and she believed she coped better when she was working. When she feels upset, she cries or displays anger, and time helps her regain control. The diagnostic assessment included recurrent moderate major depressive disorder with anxiety. (Tr. 724-32).

During visits to CarePlus Medical for physical conditions on February 18, 2018, March 27, 2018, May 17, 2018, June 19, 2018, July 27, 2018, August 11, 2018, January

24

8, 2019, February 15, 2019, May 24, 2019, July 9, 2019, and September 24, 2019, Waldrop displayed normal mood, appropriate affect, intact judgment and insight, and full orientation.   (Tr. 440, 444, 449, 462, 474, 582, 674, 690, 761, 780-81, 800).   On May 17 and August 11, 2018, she denied experiencing anxiety, depression, hallucinations, delusions, suicidal or homicidal ideation, stress, and phobia.   (Tr. 448, 581).

During visits to RMC Mediplex on July 11, 2018, and July 8, 2019, Waldrop reported experiencing anxiety and depression, but the clinical examinations did not include any mental health findings.   (Tr. 565, 632).

During visits to Birmingham Neurosurgery & Spine Group on January 18, 2016, May 25, 2016, and September 24, 2018, the physical examinations revealed alertness, cooperation, normal mood and affect, and normal attention span and concentration, though Waldrop reported anxiety and depression on January 18 and May 25, 2016.   (Tr. 484, 490-91, 499-500).

During a September 12, 2019, examination of her liver, Waldrop presented as alert, oriented, cooperative, and in no acute distress, but she displayed tearfulness and anxiousness.   Due to an "extensive work up with largely unremarkable findings," Dr. Gray opined Waldrop's symptoms were "most consistent with functional GI symptoms related to severe anxiety and depression from multiple life stressors over the last several years."   (Tr. 750-51).

25

These records reveal that Waldrop has long reported symptoms of depression and anxiety, but prior to May 26, 2020, she did not experience symptoms anywhere near as serious as those she reported to Dr. Nichols.   Indeed, by Waldrop's own reports to Dr. Nichols, her emotional condition sharply declined when her mother passed away in March 2020.   She even required hospitalization because the severity of her depression led to her failure to maintain her insulin.   As Dr. Nichols assessed Waldrop after the significant triggering event of her mother's death, Dr. Nichols' report did not relate to Waldrop's disability status on or before January 29, 2020, the date of the ALJ's decision.   *See McClain v. Soc. Sec. Admin.*, 760 F. App'x 728, 732-33 (11th Cir. 2019) (psychologist's report did not relate back to the time period of the ALJ's decision when it reflected the claimant's cognitive skills declined in the interim); *Ring v. Soc. Sec. Admin., Comm'r*, 728 F. App'x 966, 969 (11th Cir. 2018) (doctor's evaluation did not relate to the relevant time period when it reflected "the worsening of a condition or the onset of a new condition after the date of the ALJ's decision").   The Appeals Council did not err in considering the new evidence from Dr. Nichols, and if it did err, it did so only harmlessly.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 23rd day of March, 2022.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE